## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| 15375 MEMORIAL CORPORATION, et al., | ) | Case No. 06-10859(KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | **Re Dkt. No.  537** |
| SANTA FE MINERALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 06-50822(KG) |
| | ) | |
| BEPCO, L.P., formerly known as BASS | ) | |
| ENTERPRISES PRODUCTION COMPANY, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| GLOBALSANTAFE CORPORATION, | ) | |
| GLOBALSANTAFE CORPORATE SERVICES | ) | |
| INC. AND ENTITIES HOLDING, INC. | ) | |
| | ) | |
| Intervenors. | ) | **Re Dkt No. 234** |

## <u>MEMORANDUM OPINION</u>

The Court has before it the unpleasant and painful, but necessary, task of deciding

whether to impose sanctions against parties and lawyers.  Adding to the difficulty is that the

Court's decision not to dismiss the bankruptcy case, later reversed, is at the core of the

dispute.  Further, the Court is rarely asked to impose sanctions, especially against lawyers,

because of the ability, civility and professionalism of the lawyers who grace the Court's bar,

qualities also attributable to the lawyers who appeared in this case.  The Delaware Bar is

largely self-policing and, therefore, the state and federal courts in Delaware only infrequently

address requests for sanctions.  Here, the bitterness of the case and the cost to the moving party contributed to the request.  It is left to the Court to decide if sanctions are warranted, and, if so, in what amount and against whom.

## Parties

1.      "BEPCO" is BEPCO, L.P., f/k/a Bass Enterprises Production Company, the moving party.

2.      The "Debtor Parties," consist of (i) 15375 Memorial Corporation ("Memorial") and Santa Fe Minerals Inc. ("Santa Fe," and together with Memorial, the "Debtors"),  (ii) their counsel (a) Stevens & Lee P.C. ("S&L") and (b) Kean Miller Hawthorne D'Armond McCowan & Jarman LLP ("Kean Miller"), and (iii) David E. Faure ("Faure"), individually and in his capacities as an officer of Memorial and representative of Santa Fe.

3.      The "GSF Parties," consist of (i) GlobalSantaFe Corporation ("GSF"), GlobalSantaFe Corporate Services Inc. ("GSFCSI"), and Entities Holdings Inc. ("EHI," and together with GlobalSantaFe and GSFCSI, the "GSF Entities"), (ii) their counsel (a) Locke Lord Bissell & Liddell LLP ("Lock Lord") and (b) Womble Carlyle Sandridge & Rice, PLLC ("Womble Carlyle"), and (iii) Faure, individually and in his capacities as an employee of GSFCSI and as an officer of GSFCSI and EHI.

2

## PROCEDURAL HISTORY

The history of the case is pivotal to the Court's determination of BEPCO's motion for sanctions against the Debtor Parties and the GSF Parties. The Court will rely upon the findings in its reported opinions[1] which the District Court and the Third Circuit of Appeals adopted, as discussed below.[2] It would be difficult to condense the history of the case and the reported opinions provide the background for the sanctions decision in detail. However, a brief summary of the most pertinent background facts will place the motion for sanctions in the necessary perspective and is taken from the Third Circuit's opinion (589 F.3d at 609-613).

1.      The parties are all companies involved in oil and gas exploration. The Debtors are both subsidiaries of GlobalSantaFe.

2.      Memorial is a holding company incorporated in Delaware and is the immediate parent of Santa Fe. It has no employees and engages in no business other than acting as the sole shareholder of Santa Fe. In June 2001, Memorial voluntarily dissolved, but that dissolution was revoked in June 2004.

3.      Santa Fe was an oil and gas exploration company incorporated in Wyoming. On December 8, 2000, it filed for dissolution under Wyoming law. Santa Fe's assets were

---

[1] *See SantaFe Minerals, Inc. v. BEPCO, L.P.* (*In re 15375 Memorial Corp.*) 382 B.R. 652 (Bankr. D. Del. 2008), *modified* on reargument, 386 B.R. 548.

[2] *See BEPCO, L.P. v. 15375 Memorial Corp.* (*In re 15375 Memorial Corp.*), 400 B.R. 420 (D.Del. 2009) and *In re 15375 Memorial Corp.*, 589 F.3d 605 (3d Cir. 2009).

upstreamed to GSF and related entities.  It has no officers, directors or employees and engages in no business.  Santa Fe did not publish notice of its dissolution until August 4, 2006.  Santa Fe therefore may not have been able to use the Wyoming state law statute of limitations defense for dissolved corporations until August 4, 2009.

4.      GSF is a Cayman Islands corporation that indirectly owns Memorial and Santa Fe.  *Id.*  The GSF Entities, together with Memorial and Santa Fe, are "one of the world's largest offshore oil and gas drilling contractors and a leading provider of drilling services."

5.      EHI is a wholly owned, direct subsidiary of GSF.  It is the parent and sole shareholder of Memorial, and it also owns several other subsidiaries.  EHI is a holding company and has no employees.  *Id.*

6.      GSFCSI is a wholly owned, indirect subsidiary of GSF.  It provides corporate services to Memorial, Santa Fe, and the GSF Entities.  GSFCSI also maintains the Debtors' books and records.  *Id.*

7.      Faure was charged with marshaling the Debtors' assets prior to the filings of their bankruptcy petitions, dealing with the Debtors' liabilities, and working on the Debtors' bankruptcy cases.  Faure held other important decision-making responsibilities at GSFCSI, EHI, and Memorial.  He was employed by GSFCSI as vice president, assistant general counsel and assistant secretary.  As an employee of GSFCSI, Faure provided "legal services to EHI.  Faure also served as vice president and assistant secretary of Memorial and EHI. He reported to and took direction from James L. McCullough, the senior vice president and

general counsel of GSF. Faure had to obtain McCullough's approval before he could file the Debtors' bankruptcy petitions. Faure consulted McCullough while preparing the Debtors' bankruptcy petitions. *Id.* Faure also sought legal advice from McCullough regarding Memorial on matters unrelated to bankruptcy prior to filing its bankruptcy petition.

8.    All of Memorial's officers were also officers of EHI and GSFCSI, and all of Memorial's directors held positions at GSF. Three EHI directors held positions as GSF officers.

9.    Faure oversaw the recovery of funds from the GSF Entities for the benefit of the Debtors' estates. This included seeking recovery of funds that were upstreamed to EHI and Memorial after Santa Fe's dissolution. After an initial investigation, Faure did not pursue the claims.

10.    BEPCO's involvement in the Debtors' bankruptcies arose from exploration of a property of which BEBCO and Santa Fe are both in the chain of title, a 1938 mineral lease of land in Avoyelles Parish, Louisiana (the "Tebow Property"). Both companies were accused of contaminating the Tebow Property.

11.    On April 18, 2005, individuals affected by the contamination of the Tebow Property (the "Tebow Plaintiffs") filed suit in Louisiana state court naming Santa Fe, BEPCO, and others as defendants, seeking damages of $320 million for the contamination (the "Tebow Action"). The Tebow Plaintiffs alleged that water produced from oil wells on the Tebow Property was disposed of in unlined earthen pits on their property. The water

5

contained salt and dangerous minerals, metals, and radioactive materials, and the contamination migrated both horizontally and vertically into the surrounding soil and ground water. Some of the pollutants entered and contaminated a drinking water aquifer.

12. As a result of trial preparation, the Debtors and the GSF Entities learned that the Tebow Plaintiffs' expert reports indicated that the worst contamination on the Tebow Property occurred in the East Pit area, an area located on the 1938 mineral lease for which both BEPCO and Santa Fe were in the chain of title. They also learned from their own expert and the Tebow Plaintiffs' expert, that the East Pit was probably constructed after 1965 and that BEPCO assigned the 1938 mineral lease to a different company in 1964. The Debtors and the GSF Entities determined that BEPCO's liability was likely to be less than other companies that used the Tebow Property after 1964. Santa Fe thus knew that it, not BEPCO, was to blame for pollution around the East Pit. Santa Fe also learned that the contamination caused to the drinking water aquifer by the East Pit would cost approximately $189 million to remediate.

13. The Tebow Plaintiffs' complaint had warned that if a defendant filed for bankruptcy, they would drop claims or parties from the Tebow Action. The GSF Entities therefore were aware that filing the Debtors for bankruptcy would permit them to avoid liability in the Tebow Action.

14.    The Tebow Action was scheduled for trial beginning October 11, 2006. Leading up to the trial, BEPCO and Santa Fe participated in depositions, hired experts and engaged in fact and expert discovery.  Santa Fe hoped that its dissolution under Wyoming law would be a defense to the Tebow Action, but it was concerned that its failure to publish notice until 2006 would undermine the defense.  In June 2006, the Tebow Plaintiffs and BEPCO informed Santa Fe that they would pursue the GSF Entities under an alter ego theory.  During the Tebow Action, BEPCO asserted claims against Santa Fe and its insurers for the damage done to the Tebow Property.  It also asserted alter ego claims against the GSF Entities.

15.    On August 8, 2006, eight days before the Debtors filed for bankruptcy, Memorial, through Faure, executed a demand note issued by EHI.  The demand note provided a revolving credit line of $500,000 in exchange for, among other things, Memorial accepting all liabilities and agreeing to defend and indemnify GSF from any claims, whether based on an alter-ego, single business enterprise or other principles, relating to Santa Fe's operations.  A few days later, Memorial obtained $100,000 from EHI under the demand note to pay bankruptcy costs.

16.    On August 16, 2006, eight days after executing the demand note, the Debtors filed their Chapter 11 bankruptcy petitions.  The next day, the Tebow Plaintiffs dismissed Santa Fe from the Tebow Action.

17.    On August 22, 2006, BEPCO filed a third party complaint in the Tebow Action seeking relief from the GSF Entities under an alter ego theory.  That complaint was dismissed without prejudice on the same day for procedural reasons.  On August 25, 2006, BEPCO refiled its third party complaint. In response, the Debtors accused BEPCO of violating the automatic stay of litigation outside the bankruptcy proceedings.  On October 19, 2006, BEPCO sought relief from the automatic stay to file its third party complaint in Louisiana state court, which  the Court denied.

18.    In February 2007, BEPCO went to trial in the Tebow Action and settled with the Tebow Plaintiffs before a judgment was rendered.  In the settlement, BEPCO agreed to pay the Tebow Plaintiffs $20 million and assist in cleaning the Tebow Property in exchange for an assignment to BEPCO of the Tebow Plaintiffs' property damage claims. On April 27, 2007, BEPCO filed a proof of claim in the Bankruptcy Court against the Debtors based on Santa Fe's liabilities in the Tebow Action.  BEPCO asserted claims against Santa Fe for assignment, contribution, indemnity, and for the contamination of the Tebow Property. BEPCO also asserted claims against Memorial and the GSF Entities based on Wyoming law to recover distributions made at dissolution and on alter ego and other related theories.

19.    On February 15, 2008, the Court granted BEPCO relief from the automatic stay to pursue its action against Santa Fe and Santa Fe's insurers in Louisiana state court.  The Court also held that BEPCO's assertion of alter ego claims against Memorial and the GSF Entities did not violate the automatic stay.  The Court did not, however, permit BEPCO to

proceed with its alter ego claims in Louisiana state court at that time.  It left open the issue of whether Memorial and the GSF Entities could be held liable under an alter ego theory, requesting further briefing on the issue by the parties.  It did so, in part, because the Debtors and the GSF Entities  insisted that any alter ego claim against the GSF Entities was property of Debtors' estates and, thus, could not be asserted by BEPCO.

The Third Circuit summarized the events as follows (589 F.3d at 614):

> In sum, after the Debtors filed for bankruptcy, the Tebow Plaintiffs dismissed Santa Fe from the Tebow Action and settled with BEPCO. As part of that settlement, BEPCO was assigned the Tebow Plaintiffs' claims for property damage. BEPCO asserted those claims against Santa Fe, Santa Fe's insurers, Memorial, and the GSF Entities in Louisiana state court. The Bankruptcy Court granted BEPCO relief from the automatic stay for the claims against Santa Fe and its insurers, but it did not permit BEPCO to proceed with its alter ego claims against Memorial and the GSF Entities.

The Third Circuit concluded emphatically that:

1.     The GSF Entities systematically used the Debtors for their own protection from litigation liabilities.  589 F.3d at 624.

2.     The bankruptcy "was a litigation tactic to protect the GSF Entities." *Id.* at 625.

3.     The Debtors and the GSF Entities timed the bankruptcy filings "as a litigation tactic to avoid liability in the Tebow Action".  *Id.*

4.     The Debtors "filed their bankruptcy petitions with the knowledge that doing so. . .would shield the GSF Entities from litigation. . .."  *Id.* at 625-26.

9

5.      The Debtors filed their bankruptcy petitions because they and the GSF Entities faced substantial liability, as much as $189 million. *Id.* at 626.

6.      "[T]he tactical advantages gained by the Debtors and the GSF Entities against BEPCO are obvious. The Debtors' bankruptcy filings protected the GSF Entities from liability for the damage to the Tebow Property." *Id.*

## RULING

The voluminous filings in support of and in opposition to the motion for sanctions belie the relative simplicity of the issue. Two higher courts firmly and unequivocally ruled that Debtors did not file their bankruptcy petitions in good faith and to benefit the GSF Entities. BEPCO suffered harm as a result. From the Latin expression "*ubi jus ibi remedium*" comes the equitable maxim "Equity will not suffer a wrong to be without a remedy." The District Court and Third Circuit both concluded that BEPCO was damaged and therefore the Court finds BEPCO is entitled to recover for its damages. The questions for the Court thus become: from whom and in what amount?

### Timeliness of BEPCO'S Request for Rule 9011 Sanctions

BEPCO filed its request for Rule 9011 sanctions following the Third Circuit's ruling. Debtors and the GST Entities argue that the Third Circuit has made it clear that the Court may not decide a sanctions motion after dismissal. *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90 (3d Cir. 1988); *In re Nicola*, 65 Fed. Appx. 759, 2003 WL 1084630 (3d Cir. Mar. 11, 2003); and *Raymark Industries, Inc. v. Baron*, 1997 WL 35933 (E.D. Pa. June 23, 1997).

The Court will make short shrift of the timeliness argument.  First, as a procedural matter the Court has not dismissed the Chapter 11 cases or the adversary proceeding, a ministerial act given the Third Circuit's ruling but a necessity nonetheless.  Second, the law in this District is that the Court retains post-dismissal jurisdiction to address matters necessary to properly finalize the bankruptcy case.  *In re SGL Carbon Corp.*, 249 B.R. 615, 617 (D.Del. 2000).  The Court's ability to adjudicate Rule 9011 sanctions is essential to its oversight of attorneys' actions and conduct.  *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990) for the clear proposition that a federal court may consider collateral issues after an action is no longer pending, particularly when the issue concerns the alleged abuse of the judicial process which may involve lawyers.  *Accord*, *In re Schaefer Salt Recovery Inc.*, 542 F.3d 90, 98 (3d Cir. 2008).  The Debtors and the GSF Entities are correct that the Third Circuit adopted a supervisory rule in *Pensiero* requiring the filing of Rule 11 motions before dismissal to avoid piecemeal appeals.  In this case, the Court is satisfied that BEPCO moved with due speed.  Any earlier filing would have been premature.  The Court therefore rejects Debtors' and the GSF Entities' untimeliness argument.

## Rule 9011 Issues

Courts should exercise great discretion when applying Rule 9011 sanctions.  *In re Aphton Corp.*, 423 B.R. 76, 98 (Bankr. D. Del. 2010).  Motions for sanctions are objectively tested by the reasonableness of the filing in question under the circumstances. *Id.* Furthermore, the court should avoid hindsight bias by considering the reasonableness of the

party's belief at the time of the filing.  *Id*. Courts reserve Rule 9011 sanctions for "exceptional circumstances" where a claim is "patently unmeritorious or frivolous."  *Id*., *citing Dura Sys., Inc.* v. *Rothbury Inv., Ltd.*, 886 F.2d 551, 556 (3d Cir. 1989).  The Advisory Committee Notes for Rule 11 direct that, "[t]he rule is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories."  Rule 11 Advisory Committee Notes.[3]  Consequently, the test for Rule 9011 sanctions is a stringent one.

While courts may use Rule 9011 sanctions at their discretion, policy considerations direct courts to exercise restraint.  These policy considerations are particularly important in this Circuit.

> The standard for imposing sanctions under Rule 11 is stringent because such sanctions (1) are in "derogation of the general American policy of encouraging resort to the courts for peaceful resolution of disputes," (2) tend to "spawn satellite litigation counter-productive to efficient disposition of cases," and (3) increase tensions among the litigation bar and between the bench and the bar."

*In re Aphton Corp.*, 423 B.R. at 96 *citing Doering* v. *Union County Bd. Of Chosen Freeholders*, 857 F.2d 191, 194 (3d Cir. 1988); *Gaiardo* v. *Ethyl Corp.,* 835 F.2d 479, 483 (3d Cir. 1987); *Eastway Constr. Corp.* v. *City of New York*, 637 F.Supp. 558, 564 (E.D.N.Y. 1986).  Therefore, a court should impose Rule 9011 sanctions only in egregious circumstances.

---

[3] Because Rule 9011 tracks (but is not identical to) the language of Rule 11, the Rule 11 factors developed by the Third Circuit are persuasive.  *In re Aphton Corp.*, 423 B.R. at 96, *citing Cinema Serv. Corp.* v. *Edbee Corp.*, 774 F.2d 584, 585-86 (3d Cir. 1985).

Like courts' *sua sponte* sanctions under FRCP 11, requests Rule 9011 sanctions for filing a petition require heightened scrutiny.  In *sua sponte* circumstances, unlike the situation in which an opposing party moves for Rule 9011 sanctions, there is no "safe harbor" in the rule allowing lawyers to correct or withdraw their challenged filings.  *United Nat. Ins. Co.* v. *R&D Latex Corp.*, 242 F.3d 1102, 1115-16 (9th Cir. 2001) *citing* FRCP 11(b)(2).  Courts will therefore impose "*sua sponte* sanctions '. . .only in situations that are akin to contempt of court.'"  *United Nat. Ins. Co.* v. *R&D Latex Corp.*, 242 F.3d at 1102 *citing Barber* v. *Miller*, 146 F.3d 707, 711 (9th Cir. 1998).  Consequently,  bankruptcy courts should be particularly cautious when evaluating Rule 9011 sanctions for filing a petition.

The Debtors and the GSF Entities have challenged the Rule 9011 sanctions application on the additional procedural ground that BEPCO did not comply with the 21 day notice and "safe harbor" provision in Rule 9011.  Such notice would have been fruitless in this case, as the issues had already been fully litigated and addressed by three courts.  Debtors and the GSF Entities could not retract their actions at this late date, regardless of the amount of notice.  Bankruptcy petitions, like sanctions, are outside of the safe harbor protections from sanctions.  *See* Fed. R. Bankr. P. 9011 Advisory Committee Notes ("The 'safe harbor' provision contained in subdivision (c)(1)(A), which prohibits the filing of a motion for sanctions unless the challenged paper is not withdrawn or corrected within a prescribed time after service of the motion, does not apply if the challenged paper is a petition.").

The Court, which on several occasions ruled that the Debtors had filed their bankruptcy petitions in good faith, does not find that any of the attorneys, law firms or Faure violated Rule 9011.   The Court fully recognizes and respects the District Court's and the Third Circuit's findings that the Court erred in not dismissing the cases.   The attorneys and Faure did not mislead or make misrepresentations or dissemble.   The Court simply made the wrong decision.   The opinions of the District Court and the Third Circuit could not be clearer or more emphatic that the Court simply made the wrong decision.

In the absence of misconduct toward the Court, it would be disingenuous were the Court, having sustained the cases, to impose Rule 9011 sanctions on the attorneys or parties who filed or were otherwise involved in the cases.   To begin, it is not a *per se* violation of Rule 9011 to file a Chapter 11 petition lacking good faith.   *See*, *e.g.*, *Endrex Invs. Inc. v. Mauna Lani Resort, Inc.* ( *In re Endrex Invs. Inc.*) 111 B.R. 939, 944 (D.Col. 1990); *Whitney Apartments Associates v. McGlamry* (*In re Whitney Place Partners*).   The test for finding a violation of Rule 9011 is proof by the movant by "clear and convincing evidence" that no reasonable attorney could conclude that a debtor filed the case in good faith.   In contrast, the District Court and Third Circuit addressed whether the Debtors and the GSF Entities established by a "preponderance of the evidence" that the filings were not in good faith. Here, the Court concluded that Debtors filings were in good faith based upon a full evidentiary record.   It would therefore be hypocrisy were the Court to find that "no reasonable attorney" would conclude the filings were justifiable.   The Court is unwilling to

14

stretch for such a ruling given its own denial of the motion to dismiss and the availability of another, more appropriate remedy. For the same reasons, the Court will not order the Debtors' attorneys to disgorge their fees.

## Sanctions Against the GSF Entities

The "villains" in these cases are the GSF Entities. They caused the bankruptcy cases to be filed to protect their interests, funded the cases, misused Faure's conflict of interest for their benefit and employed vexatious, aggressive litigation tactics against BEPCO. The following summary of the facts supports beyond cavil the Court's conclusions:

1.      The Debtors were non-operating entities with no or minimal assets. The Tebow Action was, therefore, of little threat to Debtors who, as a practical matter, were judgment proof. It was when, and not until, BEPCO brought the GSF Entities into the Tebow Action as alter egos of Santa Fe that the Debtors filed the bankruptcy cases.

2.      The GSF Entities funded the bankruptcy cases.

3.      The GSF Entities controlled the Debtors. At the center of the control situation, answerable to the GSF Entities, was Faure. The Court found that (and the Third Circuit accepted) that:

- •      Faure, the Debtors' sole representative in these cases, was employed by GSFCSI, acted as an officer of GSFCSI and EHI and provided litigation related legal services for EHI. *Id.* at 624-25.

- •      Faure, who signed each of the Debtors' bankruptcy petitions, admitted that he could not make the decision on his own to cause the Debtors to file bankruptcy. Rather, he reported to James McCullough, GSF's general counsel, on legal matters related to the Debtors and had to receive McCullough's approval to file the Debtors' bankruptcy petitions. *Id.* at 624-25.

15

- Faure participated in negotiations with EHI, a company for which he was then an officer, over the Demand Note, which provided the GSF Entities with numerous concessions and insulated the GSF Entities from liability related to Santa Fe while resulting in the funding of only $100,000 for the bankruptcy cases. *Id.* at 624.

- The Debtors knew prior to filing their petitions that the Tebow Plaintiffs would almost certainly dismiss them from the Tebow Action upon their filing for bankruptcy because they had so stated in their complaint. This, of course, is exactly what occurred one day after the bankruptcy petitions were filed. *Id.* at 625-26.

- Faure admitted that filing a lawsuit against GSF on behalf of the Debtors would jeopardize his job. *Id.* at 625.

- One of the Debtors' first actions after filing their bankruptcy cases was to threaten BEPCO with sanctions for violating the automatic stay and file an action against BEPCO seeking, among other things, a declaration that the alter ego causes of action that BEPCO sought to pursue were estate property protected by the automatic stay. Similarly, one of the first actions of the GSF Entities was to intervene in the Debtors' action and pursue additional counts via their intervention complaint seeking a determination on the merits that the GSF Entities had no liability to the Debtors' estates or BEPCO on any alter ego or similar theory. *Id.*

The GSF Entities' misuse of the bankruptcy process, which resulted in significant, foreseeable and intended harm to BEPCO, compels the Court to impose sanctions. It is clear that the GSF Entities were in complete, direct control of Debtors and were dictating the filing and course of the bankruptcy cases.

The Court has the inherent authority to impose sanctions for abuses in bankruptcy cases. *Fellheimer, Eichen & Braveman, P.C. v. Charter Tech, Inc.*, 57 F.3d 1215, 1224 (3d Cir. 1995). Reviewing the case, and with the benefit of the rulings by the District Court and Third Circuit, the Court recognizes the vexatious conduct by the GSF Entities directly or

16

through their control of Debtors.  The GSF Entities' impermissible tactics included:

- The Debtors' prosecution of their adversary proceeding and motion for preliminary injunctive relief against BEPCO alleging violations of the automatic stay based on BEPCO's attempt in the Tebow Action to pursue its third party petition against the GSF Entities, notwithstanding the fact that BEPCO had already appeared before this Court and acknowledged that it would not seek to go forward with the third party petition until this Court had determined the applicability, if any, of the automatic stay and BEPCO's right to relief from the stay.

- The GSF Entities' filing of a complaint in intervention which sought to require BEPCO to litigate the merits of the alter ego claims in this Court before its motions to dismiss the bankruptcy cases and for relief from the automatic stay were decided.

- The Debtors' tactical filing of a motion for summary judgment seeking to compel BEPCO to litigate in this Court the merits of its claims against Santa Fe arising from the Tebow Action.  The summary judgment motion was filed three days after the conclusion of trial on BEPCO's motion to dismiss the bankruptcy cases and was timed to distract BEPCO from post-trial briefing, which was then ongoing.

- The Debtors filing of multiple versions of a plan of confirmation while BEPCO's appeal from the denial of the motion to dismiss the bankruptcy cases was pending, including one that the Court held to be facially unconfirmable. Each of the plans filed by the Debtors would have fully released the GSF Entities from the alter ego claims, and other claims, that BEPCO sought to assert and would have provided BEPCO, at most, nominal consideration.

- The Debtors' filing, again during the pendency of BEPCO's appeal, of a motion to approve an insider settlement with the GSF Entities that was entered into without the involvement of any non-insider creditors and, like the plans, purported to release the GSF Entities from alter ego type claims.

- The failure and refusal of the Debtors' professionals to timely file fee applications, which increased BEPCO's cost, delayed the progress of proceedings by forcing it to seek such information in discovery and hid the extent of the estates' administrative insolvency from the Court.

- The Debtors' filing and prosecution of a motion to estimate BEPCO's claims, which was presented only after the Court had modified the automatic stay to allow BEPCO to liquidate those claims in the Louisiana Court and pursue recoveries from insurance proceeds.

- The opposition of the Debtors and the GSF Entities to BEPCO's request to this Court to stay certain proceedings in the bankruptcy cases while its appeal from the denial of its motion to dismiss the bankruptcy case was pending.

- The request of the Debtors and the GSF Entities to "abate" the bankruptcy cases, which was made only after it became clear that this Court, prior to the resolution of the appeals, would not allow them to proceed with their agendas of (i) forcing BEPCO to litigate the merits of its claims in this Court and (ii) trying to go forward with plans and settlements that would have released the alter ego claims and denied BEPCO access to insurance proceeds without providing BEPCO reasonable compensation for its claims.

The foregoing actions command the Court to invoke its inherent authority, as well as

28 U.S.C. § 1927, which provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceeding in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

The Court has thoroughly and laboriously reviewed the entire docket of the case and

has reread the leading motions and memoranda. The result is the Court's inescapable

conclusion – and finding – that the GSF Entities improperly and intentionally used the

bankruptcy cases to thwart BEPCO's efforts for relief in the bankruptcy cases. When

BEPCO sought an early decision on its motion to dismiss, the GSF Entities obtained delay

by requesting discovery. The GSF Entities also filed a complaint in intervention against

BEPCO seeking a declaratory judgment that no alter ego issues existed – a non-party seeking

18

to litigate non-bankruptcy issues while a motion to dismiss was pending. Thereafter, the GSF Entities met BEPCO's stay relief motions with efforts to litigate the alter ego issue. Debtors and the GSF Entities also sought, unsuccessfully, to commence plan confirmation which would shield the GSF Entities from liability. The Court denied approval of the disclosure statement, finding that the proposed plan was unconfirmable on its face.

At every turn, the GSF Entities manipulated and side-tracked the bankruptcy process for their own benefit, as non-debtors, and to keep BEPCO on the defensive. The Third Circuit and District Court found what this Court initially missed – that the GSF Entities were abusing the bankruptcy process at BEPCO's expense.

### DAMAGES

BEPCO has requested reimbursement of its attorneys' fees as its damages. It seeks slightly in excess of $2 million. The Debtors and the GSF Entities have requested discovery of the fees and expenses. BEPCO has submitted detailed time and expense records. The Court is very experienced in reviewing and assessing fee requests and has carefully reviewed the submission of BEPCO's attorneys. The Court is fully satisfied that they are fair and reasonable, and appropriate to the work necessary. The fees and expenses BEPCO incurred were the direct result of Debtors' filings. The Court will not permit the GSF Entities to take discovery of BEPCO's attorneys. The Court has carefully reviewed the time and expense records and will not needlessly expose BEPCO's attorneys to the time, expense and harassment that would attend such discovery. The Court therefore will exercise its discretion and will not grant discovery on BEPCO's request for fees and expenses and will thereby

prevent a "second major litigation." *In re Prudential Insurance Company America Sales Practice Litigation Agent Actions*, 148 F.3d 283, 342 (3d Cir. 1998), *citing Hensley v. Eckerhart*, 461, U.S. 424, 437 (1983).

The Debtors and the GSF Entities have argued that BEPCO is not entitled to recover its attorneys' fees and expenses relating to its appeal to the District Court and the defense of the Debtors' and the GSF Entities appeal to the Third Circuit. The Court agrees that it does not have authority to impose sanctions under 28 U.S.C. § 1927 or its inherent powers for matters which were pending before upper courts. *See Manion v. American Airlines*, 395 F.3d 428, 433-34 (D.C. Cir. 2004). Although *Manion* is not directly on point, as it addresses an appeal from a sanctions ruling, its rationale applies equally here. The appellate courts may decide, if asked, and if they deem it appropriate, whether sanctions are appropriate for matters before them, and in what amount, based upon knowledge of the appeal which the Court can not and should not determine.

Accordingly, the Court will not award as sanctions BEPCO's fees on the appeals. BEPCO may, if appropriate, apply to the District Court and the Court of Appeals for sanctions.

The Court will enter an Order, to be submitted by BEPCO, on notice, imposing judgment against the GSF Entities, jointly and severally, in an amount equaling BEPCO's attorneys' fees and expenses, but excluding time and expenses incident to the appeals.

## The GSF Entities' Additional Activity

The Court heard argument on March 10, 2010, on the motion for sanctions at which BEPCO requested, and the Court entered, an order vacating the automatic stay in its entirety. D.I. 569.  BEPCO at long last would be able to pursue its claims against the GSF Entities in state court in Louisiana.  BEPCO filed an amended petition in Louisiana the next day.  In the meantime, unbeknownst to BEPCO, the GSF Entities – one hour after the hearing, according to BEPCO – filed a complaint in Texas state court seeking a declaration that the GSF Entities do not constitute a single or common business enterprise.  BEPCO is incensed that the GSF Entities have again thwarted BEPCO's effort to litigate its alter ego claims in Louisiana state court.

The Court understands BEPCO's frustration and agrees that the GSF Entities have once more exhibited gamesmanship with the judicial system.  The Court observes that the long pending adversary proceeding before it on the alter ego issue remains extant.  The GSF Entities' machinations have thus resulted in the alter ego claims pending before three courts, two of which the GSF Entities initiated.

Dated: May 17, 2010

KEVIN GROSS, U.S.B.J.